UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-----------------------------------------------------------------X

SHAUL STERN, individually and as legal
representative of the Estate of Leah Stern,
96 Carlton Road
Suffern, New York 10901

JOSEPH STERN,
4 Steuben Street
Staten Island, New York 10304

SHIMSON STERN,
8950 Vathsurt No. 32
Thornhill, Ontario
Canada L3T6R1

YOCHEVED KUSHNER
32 Lyncrest Drive
Monsey, New York 10952

                           Plaintiffs

   - against -

THE ISLAMIC REPUBLIC OF IRAN
Ministry of Foreign Affairs
Khomeini Avenue
United Nations Street
Teheran, Iran,

THE IRANIAN MINISTRY OF INFORMATION AND SECURITY
Pasdaran Avenue
Golestan Yekom
Teheran, Iran

AYATOLLAH ALI HOSEINI KHAMENEI
Supreme Leader of the Islamic Republic of Iran
Office of the Supreme Leader
Palestine Street
Teheran, Iran

ALI AKBAR HASHEMI-RAFSANJANI
Former President of the Islamic Republic of Iran
Presidential Office
Palestine Street
Teheran, Iran

ALI FALLAHIAN-KHUZESTANI
Former Minister of Information and Security
Ministry of Information and Security
Pasdaran Avenue
Golestan Yekom
Teheran, Iran

                           Defendants.
-----------------------------------------------------------------X

Civil Action No.:

**COMPLAINT**

CASE NUMBER   1:00CV02602

JUDGE: Royce C. Lamberth

DECK TYPE: Civil General

DATE STAMP: 10/27/2000

FILED
OCT 27 2000

Plaintiffs, by their attorneys Westerman Shapiro Draghi & Miller, LLP, as and for their complaint against the defendants herein, respectfully allege as follows:

## NATURE OF ACTION

1. This is an action brought pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §1605 *et seq.*, by the beneficiaries and legal representatives of decedent Leah Stern, for a money judgment against Iran and its agents for wrongful death, personal injury and related torts. Leah Stern, an American citizen, was killed on July 30, 1997, in a terrorist bombing in an open-air market in Jerusalem, Israel.

2. Leah Stern did not immediately die from the bombing; she suffered excruciating and conscious pain before dying.

3. At the time of her death, Leah Stern was 69 years old, widowed and the mother of four children and twenty-four grandchildren.

## JURISDICTION

4. This court has jurisdiction over this matter and over defendants pursuant to 28 U.S.C. §§1330(a), 1331, 1332(a)(2), 1605(a)(7) and 28 U.S.C.A. §1605 note, *Civil Liability for Acts of State-Sponsored Terrorism*. These recently-enacted counterterrorism provisions create federal causes of action for wrongful death, personal injury and related torts against state sponsors of terrorism and their officials, employees and agents.

## VENUE

5. Venue is proper in this Court pursuant to 28 U.S.C. §1391(f)(4).

## PARTIES

6. Plaintiff Shaul Stern is, and at all times relevant hereto was, a citizen of the United

States, the son of decedent Leah Stern, and the legal representative of the Estate of Leah Stern. Shaul Stern brings this action individually, and on behalf of the Estate of Leah Stern.

7. Plaintiffs Joseph Stern, Shimson Stern and Yocheved Kushner are, and at all times relevant hereto were, citizens of the United States, and the children of decedent Leah Stern.

8. Defendant The Islamic Republic of Iran ("Iran") is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. §1603, and has been designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)).

9. Defendant The Iranian Ministry of Information and Security is, and at all times relevant hereto was the Iranian intelligence service responsible for providing material support and resources, and sponsoring the terrorists who planned and executed the extrajudicial killing of Leah Stern. Within the scope of its agency and office, The Iranian Ministry of Information and Security provided material support and resources for terrorism and performed actions which caused the death of decedent Leah Stern.

10. Defendant Ayatollah Ali Hoseini Khamenei is, and at all times relevant hereto was, the Supreme Leader of defendant Iran. Within the scope of his office, employment and agency, defendant Ayatollah Ali Hoseini Khamenei performed actions which caused the death of decedent Leah Stern.

11. Defendant Ali Akbar Hashemi-Rafsanjani is, and at all times relevant hereto was, the former president of defendant Iran. Within the scope of his office,

employment and agency, defendant Ali Akbar Hashemi-Rafsanjani performed actions which caused the death of decedent Leah Stern.

12. Defendant Ali Fallahian-Khuzestani is, and at all times relevant hereto was, the former Minister of Information and Security for defendant Iran. Within the scope of his office, employment and agency, Ali Fallahian-Khuzestani performed actions which caused the death of decedent Leah Stern.

## STATEMENT OF FACTS

13. Decedent Leah Stern was a 69 year-old American citizen. At the time of her death Leah Stern was a widow, and is survived by her four children, plaintiffs Joseph Stern, Shaul Stern, Shimson Stern and Yocheved Kushner, and twenty-four grandchildren.

14. On July 30, 1997, Leah Stern was shopping at the Mahaneh Yehuda open-air produce market in downtown Jerusalem, Israel.

15. On July 30, 1997, terrorists trained by, belonging to and acting on behalf of the HAMAS terrorist organization, willfully and deliberately detonated a massive explosive charge.

16. The bombing described herein shattered the market, killing 14 persons and injuring dozens of others (the "Terrorist Bombing"). Among those killed was Leah Stern.

17. The Terrorist Bombing did not immediately kill Leah Stern. The Terrorist Bombing first injured Leah Stern, causing her to suffer severe and devastating conscious pain and suffering, before later causing her death.

18. Within hours after the bombing, Leah Stern's children, plaintiffs Shaul Stern, Joseph Stern, Shimson Stern and Yocheved Kushner, were informed that their mother had been injured and killed. Learning of the violent and painful death of their mother caused plaintiffs great horror, distress, intimidation, anxiety, severe mental anguish and loss of society.

19. Between the time of the bombing until her death, decedent Leah Stern was, upon information and belief, conscious and in full possession of her mental faculties. The injuries to Leah Stern caused her excruciating and conscious pain and suffering during this period.

20. Responsibility for the Terrorist Bombing was claimed by the HAMAS terrorist organization. HAMAS' involvement in the Terrorist Bombing was later confirmed by statements given to the Israeli Police by HAMAS members Nur Id Kassem, Mahmoud Mussa Hamadeh and Samer Hamadeh, who were convicted by an Israeli Court of planning the Terrorist Bombing on behalf of HAMAS.

21. HAMAS, known also as "Islamic Resistance Movement" (or in Arabic: "Harakat al-Muqawama al-Islamiyya"), is an international terrorist organization which receives routine, abundant and systematic material support and resources from defendants in furtherance of its terrorist objectives and activities, as detailed herein.

**Routine Provision of Material Support and Resources to HAMAS by Defendants**

22. Since 1984 until the present time, defendant Iran has been designated by the United States Department of State as a state sponsor of terrorism pursuant to Section 6 of the Export Administration Act.

23. HAMAS is one of the international terrorist organizations to which, at all times relevant hereto, Iran provided material support and resources.

24. During the period relevant hereto, defendant Iran provided HAMAS with material support and resources within the meaning of 28 U.S.C. §1605(a)(7), in order to facilitate and further the commission of terrorist attacks by HAMAS. Such support was provided routinely and in furtherance and as implementation of a specific policy and/or practice established and maintained by defendant Iran.

25. The material support and resources provided by defendants to HAMAS within the meaning of 28 U.S.C. §1605(a)(7) includes, among other things: military and other training; training bases; facilities for, *inter alia*, training, storage of weapons and explosives and the maintenance and operation of a leadership command and operational infrastructure; safe haven; lodging; means of communication and communications equipment; financial services, including banking and wire transfer services; means of transportation; and essential utilities.

26. Defendants The Iranian Ministry of Information and Security, Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani provided material support and resources to HAMAS on behalf of defendant Iran and

in furtherance of the policies of defendant Iran, and while acting within the scope of their office, employment and agency.

27. At all relevant times, defendant The Iranian Ministry of Information and Security was an agent, representative and/or office of defendant Iran acting within the scope of its agency and/or office.

28. At all relevant times, defendant The Iranian Ministry of Information and Security engaged in the actions described herein within the scope of its agency and/or office and to further the interests of defendant Iran.

29. At all relevant times, defendant The Iranian Ministry of Information and Security was the Iranian intelligence service, functioning both within and beyond Iranian territory. Acting as an agent of defendant The Islamic Republic of Iran, defendant The Iranian Ministry of Information and Security, performed acts within the scope of its agency, within the meaning of 28 U.S.C. §1605(a)(7) and 28 U.S.C. §1605 note, which caused the death of plaintiff Leah Stern, in that defendant The Iranian Ministry of Information and Security acted as a conduit for Iran's provision of funds to HAMAS and training to terrorists under the direction of HAMAS.

30. Accordingly, defendant Iran is vicariously liable for the acts of defendant The Iranian Ministry of Information and Security.

31. At all relevant times, defendants Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani were agents, representatives, officers and employees of defendants Iran and The Iranian Ministry

of Information and Security acting within the scope of their agency, office and employment.

32. At all relevant times, defendants Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani were high officials of defendant The Islamic Republic of Iran, whose approval would be necessary to carry out the economic commitment of Iran to HAMAS and the training of terrorist in Iran.

33. At all relevant times, defendants Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani engaged in the actions described herein within the scope of their agency, office and employment and to further the interests of defendants Iran and The Iranian Ministry of Information and Security.

34. Accordingly, defendants Iran and The Iranian Ministry of Information and Security are vicariously liable for the acts of defendants Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani.

35. During the period relevant hereto, defendants provided HAMAS and its operatives with training bases and facilities on Iranian territory.

36. HAMAS and its operatives utilized the training bases and facilities provided by defendants to train for the commission of acts of terrorism. This training included the use of firearms, explosives and other weapons. HAMAS and its operatives also utilized these bases and facilities as depots for storage of weapons and explosives.

37. HAMAS and its operatives also utilized the training bases and facilities provided by defendants to establish, maintain and operate a leadership command, organizational hierarchy and operational infrastructure.

38. Additionally, at all times relevant hereto, defendants provided HAMAS and its operatives with instruction and training in terrorism activities including the use of weapons and explosives (the allegations contained in paragraphs 23-38, inclusive, collectively referred to herein as the "Terrorist Training").

39. Terrorist Training was provided to HAMAS and its operatives by and through Iranian military and intelligence officials, and other agents, employees and officials of defendants Iran and The Iranian Ministry of Information and Security acting under the command and direction of defendants.

40. In addition, at all times relevant hereto, defendants provided Terrorist Training to HAMAS and its operatives by and through the agency of other terrorist organizations which received material support and resources from defendants, and which acted as proxies and agents of defendants for the purpose of the providing such Terrorist Training to HAMAS.  The terrorist organizations which provided Terrorist Training to HAMAS, on behalf of and as agents of defendants, include HIZBOLLAH and various other terrorist organizations.

41. At all times relevant hereto, defendants provided HAMAS and its leaders, officials and operatives with lodging, safe haven and shelter, in order to prevent them from being apprehended and permit them to conduct their terrorist activities freely and unhindered.

42. In order to facilitate and further the commission of terrorist attacks by HAMAS, defendants gave substantial aid, assistance and encouragement to one another and to HAMAS, and knowingly and willingly conspired, agreed and acted in concert with one another and with HAMAS, in pursuance of a common plan and design, to provide material support and resources to HAMAS.

43. Indeed, this Court recently held, in <u>Eisenfeld et al. v. The Islamic Republic of Iran, et al.</u> (Civ. No. 98-1945(RCL)) that HAMAS receives "massive material and technical support from the Defendant, The Islamic Republic of Iran" (<u>Id</u>. at 10). The Court found that defendant Iran provides HAMAS financial support in the amount of $15,000,000 per month, and that it had provided training in the use of bombs and explosives to the HAMAS terrorists who planned and executed terrorist attacks in Israel (<u>Id</u>. at 5-6).

**FIRST CLAIM**
**AS AGAINST ALL DEFENDANTS**
**ON BEHALF OF DECEDENT LEAH STERN/**
**ESTATE OF LEAH STERN**
**<u>WRONGFUL DEATH</u>**

44. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "43" of the complaint as if set forth at length herein.

45. Defendants provided material support and resources to HAMAS in order to facilitate and further the commission of terrorist attacks by HAMAS and its operatives. Decedent Leah Stern was killed by a bomb detonated by HAMAS and its operatives acting with the material support, resources and sponsorship of defendants.

46. Defendants' actions were willful, malicious, intentional, reckless and/or unlawful and were the proximate cause of the death of decedent Leah Stern.

47. The murder of Leah Stern was an act of extrajudicial killing within the meaning of 28 U.S.C. §1605(a)(7) and 28 U.S.C.A. §1605 note.

48. The murder of Leah Stern was perpetrated by HAMAS and its operatives, which received material support and resources from defendants.

49. Such provision of material support and resources was engaged in by agents, officials, and employees of defendants Iran, including among others, defendants The Iranian Ministry of Information and Security, Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani, while acting within the scope of their agency, office and employment.

50. At the time of her death, decedent Leah Stern left surviving plaintiffs Shaul Stern, Joseph Stern, Shimson Stern and Yocheved Kushner as her only beneficiaries.

51. Prior to her death, decedent Leah Stern was 69 years of age, enjoying good health, was industrious and in possession of all her faculties.

52. As a result of the death of decedent Leah Stern, her beneficiaries have and/or will suffer pecuniary loss, and have necessarily paid funeral expenses, medical, nursing, hospital and various other expenses, and have and will also incur expenses in the settlement of the Estate of decedent Leah Stern.

53. By reason of the foregoing, decedent Leah Stern and the Estate of Leah Stern have been damaged in an amount to be determined at trial, but in no event less than the sum of fifty million ($50,000,000) dollars.

54. Defendants' conduct as described herein was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large. Decedent Leah Stern and the Estate of Leah Stern are therefore entitled to an award of punitive damages in an amount to be determined at trial.

### SECOND CLAIM
### AS AGAINST ALL DEFENDANTS
### ON BEHALF OF DECEDENT LEAH STERN/
### ESTATE OF LEAH STERN
### PAIN, SUFFERING AND SURVIVAL DAMAGES

55. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "54" of the complaint as if set forth at length herein.

56. As a result of the Terrorist Bombing caused by defendants' actions described herein, decedent Leah Stern, prior to her death, sustained great, severe, and permanent injuries to her body, head, and limbs, became sick, sore, lame and disabled and suffered great conscious pain, loss of society, shock and physical and mental anguish.

57. By reason of the above, decedent Leah Stern and the Estate of Leah Stern are entitled to damages in an amount to be determined at trial, but in no event less than two hundred million ($200,000,000) dollars.

58. Defendants' conduct as specified herein was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large.

Decedent Leah Stern and the Estate of Leah Stern are therefore entitled to an award of punitive damages against defendants in an amount to be determined at trial.

### THIRD CLAIM
### AS AGAINST ALL DEFENDANTS
### ON BEHALF OF SHAUL STERN
### LOSS OF CONSORTIUM AND SOLATIUM

59. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "58" of the complaint as if set forth at length herein.

60. At all relevant times, plaintiff Shaul Stern was the son of decedent Leah Stern.

61. As a result and by reason of the death of Leah Stern, which was caused by the actions of defendants described herein, Shaul Stern has been deprived of the services, society, guidance and consortium of his deceased mother, and has suffered severe mental anguish, bereavement and grief, and injury to his feelings.

62. By reason of the foregoing, Shaul Stern has been damaged in an amount to be determined at trial, but in no event less than the sum of twenty million ($20,000,000) dollars.

63. Defendants' conduct as specified herein was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large. Joseph Stern is therefore entitled to an award of punitive damages against defendants in an amount to be determined at trial.

## FOURTH CLAIM
## AS AGAINST ALL DEFENDANTS
## ON BEHALF OF JOSEPH STERN
## LOSS OF CONSORTIUM AND SOLATIUM

64. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "63" of the complaint as if set forth at length herein.

65. At all relevant times, plaintiff Joseph Stern was the son of decedent Leah Stern.

66. As a result and by reason of the death of Leah Stern, which was caused by the actions of defendants described herein, Joseph Stern has been deprived of the services, society, guidance and consortium of his deceased mother, and has suffered severe mental anguish, bereavement and grief, and injury to his feelings.

67. By reason of the foregoing, Joseph Stern has been damaged in an amount to be determined at trial, but in no event less than the sum of twenty million ($20,000,000) dollars.

68. Defendants' conduct as specified herein was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large. Joseph Stern is therefore entitled to an award of punitive damages against defendants in an amount to be determined at trial.

## FIFTH CLAIM
## AS AGAINST ALL DEFENDANTS
## ON BEHALF OF SHIMSON STERN
## LOSS OF CONSORTIUM AND SOLATIUM

69. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "68" of the complaint as if set forth at length herein.

70. At all relevant times, plaintiff Shimson Stern was the son of decedent Leah Stern.

71. As a result and by reason of the death of Leah Stern, which was caused by the actions of defendants described herein, Shimson Stern has been deprived of the services, society, guidance and consortium of his deceased mother, and has suffered severe mental anguish, bereavement and grief, and injury to his feelings.

72. By reason of the foregoing, Shimson Stern has been damaged in an amount to be determined at trial, but in no event less than the sum of twenty million ($20,000,000) dollars.

73. Defendants' conduct as specified herein was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large. Shimson Stern is therefore entitled to an award of punitive damages against defendants in an amount to be determined at trial.

### SIXTH CLAIM
### AS AGAINST ALL DEFENDANTS
### ON BEHALF OF YOCHEVED KUSHNER
### LOSS OF CONSORTIUM AND SOLATIUM

74. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "73" of the complaint as if set forth at length herein.

75. At all relevant times, plaintiff Yocheved Kushner was the daughter of decedent Leah Stern.

76. As a result and by reason of the death of Leah Stern, which was caused by the actions of defendants described herein, Yocheved Kushner has been deprived of the services, society, guidance and consortium of her deceased mother, and has suffered severe mental anguish, bereavement and grief, and injury to her feelings.

77. By reason of the foregoing, Yocheved Kushner has been damaged in an amount to be determined at trial, but in no event less than the sum of twenty million ($20,000,000) dollars.

78. Defendants' conduct as specified herein was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large. Yocheved Kushner is therefore entitled to an award of punitive damages against defendants in an amount to be determined at trial.

## SEVENTH CLAIM
## AS AGAINST ALL DEFENDANTS
## CIVIL CONSPIRACY

79. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "78" of the complaint as if set forth at length herein.

80. Defendants knowingly and willingly conspired, planned and agreed to sponsor and provide material support and resources for the commission of acts of extrajudicial killing by terrorist organizations, including the bombing of the bus in which decedent Leah Stern was killed.

81. As a result and by reason of the death of Leah Stern, which was caused by defendants' conspiracy described herein, plaintiffs suffered damages in an amount to be determined at trial, but in no event less than three hundred thirty million ($330,000,000) dollars. Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages.

82. Defendants' conduct as specified herein was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large. Plaintiffs are therefore entitled to an award of punitive damages against defendants in an amount to be determined at trial.

## EIGHTH CLAIM
### AS AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS VICARIOUS LIABILITY/RESPONDEAT SUPERIOR

83. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "82" of the complaint as if set forth at length herein.

84. At all relevant times, defendants Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani were agents, officers and/or employees of defendants The Iranian Ministry of Information and Security and The Islamic Republic of Iran acting within the scope of their agency, office and/or employment. At all relevant times, defendants Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani engaged in the actions described herein within the scope of their agency, office and/or employment and in furtherance of the interests of defendants The Iranian Ministry of Information and Security and The Islamic Republic of Iran.

85. Defendants The Iranian Ministry of Information and Security and The Islamic Republic of Iran authorized and/or condoned the conduct of defendants Ayatollah Ali Hoseini

Khamenei, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani and HAMAS in providing material support and resources for, and in carrying out, the Terrorist Bombing.

86. Accordingly, defendants The Iranian Ministry of Information and Security and The Islamic Republic of Iran are vicariously liable for the acts of defendants Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani and HAMAS.

87. At all relevant times, defendant The Iranian Ministry of Information and Security was an agent and/or office of defendant The Islamic Republic of Iran acting within the scope of its agency and/or office.

88. At all relevant times, defendant the Iranian Ministry of Information and Security engaged in the acts described herein within the scope of its agency and/or office and to further the interest of defendant Iran. Iran authorized and/or condoned the conduct of defendant The Iranian Ministry of Information and Security.

89. Accordingly, defendant Iran is vicariously liable for the acts of defendant, the Iranian Ministry of Information and Security.

90. Defendants' conduct as specified herein was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large. Plaintiffs are therefore entitled to an award of punitive damages against defendants in an amount to be determined at trial.

WHEREFORE, plaintiffs request judgment against the defendants, jointly and severally, as follows:

a. On the First Claim, an amount to be determined at trial but no less than fifty million ($50,000,000) dollars, and punitive damages in an amount to be determined at trial;

b. On the Second Claim, an amount to be determined at trial but no less than two hundred million ($200,000,000) dollars, and punitive damages in an amount to be determined at trial;

c. On the Third Claim, an amount to be determined at trial but no less than twenty million ($20,000,000) dollars, and punitive damages in an amount to be determined at trial;

d. On the Fourth Claim, an amount to be determined at trial but no less than twenty million ($20,000,000) dollars, and punitive damages in an amount to be determined at trial;

e. On the Fifth Claim, an amount to be determined at trial but no less than twenty million ($20,000,000) dollars, and punitive damages in an amount to be determined at trial;

f. On the Sixth Claim, an amount to be determined at trial but no less than twenty million ($20,000,000) dollars, and punitive damages in an amount to be determined at trial;

g. On the Seventh Claim, an amount to be determined at trial but no less than three hundred thirty million ($330,000,000) dollars, and punitive damages in an amount to be determined at trial;

h. On the Eighth Claim, an amount to be determined at trial but no less than three

hundred thirty million ($330,000,000) dollars, and punitive damages in an amount to be determined at trial;

    i.    On all causes of action, an award of attorneys' fees, costs and disbursements, together with such other, further and different relief the Court deems just, proper and equitable.

Dated: Washington, D.C.
         October 27, 2000

    Yours, etc.
    Mintz, Levin, Cohn, Feris, Glovsky and Popeo, P.C.

By: _____
    William A. Davis ( 422108 )
    Attorneys for Plaintiffs
    701 Pennsylvania Avenue, N.W.
    Suite 900
    Washington, D.C. 20004-2608
    (202) 434-7300

Westerman Shapiro Draghi & Miller, LLP

By: _____
    Jeffrey A. Miller (JAM:6352)
    600 Old Country Road, Suite 500
    Garden City, New York 11530
    (516) 622-9200
    <u>Special Counsel</u>
    Joshua A. Adler, Esq. (JA:8834)