UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-----------------------------------------------------------------------X

SHAUL STERN, Individually and as legal representative      Case No.:  1:00CV02602 (RCL)
of the Estate of LEAH STERN, JOSEPH STERN,
SHIMSON STERN, YOCHEVED KUSHNER,

                                        Plaintiffs,

        -against-

THE ISLAMIC REPUBLIC OF IRAN,                             **FILED**
(aka Iran, The Republic of Iran, Republic of Iran, The
Government of Iran, Iranian Government, and               JUL 1 7 2003
Imperial Government of Iran)
THE IRANIAN MINISTRY OF INFORMATION                      NANCY MAYER-WHITTINGTON, CLERK
AND SECURITY, AYATOLLAH ALI HOSEINI                            U.S. DISTRICT COURT
KHAMENEI, ALI AKBAR HASHEMI-RAFSANJANI, and
ALI FALLAHIAN-KHUZESTANI,

                                        Defendants.

-----------------------------------------------------------------------X


<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>


**I. BACKGROUND**

        This is an action for wrongful death, personal injury and related torts against the Islamic

Republic of Iran, the Iranian Ministry of Information and Security, and three senior officials of

the Iranian government. The decedent, Leah Stern, was a United States citizen who was killed  at

the age of 69 in the terrorist bombing in a market in Jerusalem, Israel on July 30, 1997. The

plaintiffs, who are the children of Leah Stern, brought this action under the Foreign Sovereign

Immunities Act ("FSIA") of 1976, 28 U.S.C. §§1602-1611.

        The FSIA establishes federal court jurisdiction over foreign states and their officials,

agents and employees in certain enumerated instances.  In particular, the FSIA eliminates the

sovereign immunity of foreign states and creates a federal cause of action for acts of state-sponsored terrorism "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency . . . ". 28 U.S.C. §1605(a)(7). The FSIA further provides that "an official, employee, or agent of a foreign state designated as a state sponsor of terrorism . . . shall be liable to a United States national or the national's legal representatives for personal injury or death caused by acts . . . for which the courts of the United States may maintain jurisdiction . . . ". 28 U.S.C. §1605 note, Civil Liability for Acts of State Sponsored Terrorism.

The Defendants, despite being properly served with process pursuant to 28 U.S.C. 1608, have failed to answer or enter an appearance in this matter, and Defendants' default was entered by the Court on February 13, 2002, pursuant to 28 U.S.C. §1608(e) and Fed.R.Civ.P. 55(a). Notwithstanding indicia of Defendants' willful default, however, this Court is compelled to make further inquiry prior to entering a judgment by default against Defendants. The FSIA requires that a default judgment against a foreign state be entered only after a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. §1608(e); *see also Flatow v. The Islamic Republic of Iran, et al.*, 999 F. Supp. 1, 6 (1998).

This Court has engaged in a careful review of the evidence presented in this case, in light of *Flatow*, 999 F. Supp. 1, and the other reported cases under the antiterrorism provisions of the FSIA. *See, e.g., Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13 (D.D.C. 2002); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001); *Eisenfeld* v. *Islamic*

*Republic of Iran*, 172 F. Supp. 2d 1 (D.D.C. 2000); *Jenco* v. *Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001); *Daliberti* v. *Republic of Iraq*, No. 96-1118, 2000 WL 684813 (D.D.C. May 23, 2000);   *Anderson* v. *The Islamic Republic of Iran*, 90 F. Supp. 107 (D.D.C. 2000); *Ciccippio* v. *The Islamic Republic of Iran*, 18 F. Supp. 2d 62  (D.D.C. 1998); *Alejandre v. Republic of Cuba*, 996 F. Supp 1239 (S.D.Fla. 1997).   Based upon the extensive evidence presented, the Court concludes that the plaintiffs have established their claim and right to relief as set forth below.

## II.    <u>FINDINGS OF FACTS</u>

The Court received testimony and evidence on the matter of defendants' liability and plaintiffs' damages on January 3, 2003.  The following findings of fact are based upon the sworn testimony of the plaintiffs' expert witnesses, Dr. Reuven Paz, Dr. Patrick Clawson, Mr. Ronni Shaked and Dr. Alan Friedman, the testimony of the plaintiffs themselves, and the voluminous exhibits entered into evidence.

Plaintiffs have "established [their] claim or right to relief by evidence that is satisfactory to the Court," as required by 28 U.S.C. § 1608(e). The Court finds the following facts to be established by "clear and convincing evidence, which would have been sufficient to establish a prima facie case in a contested proceeding." *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 16 (D.D.C. 2002).

---

The Court by its Order, dated December 18, 2002, permitted plaintiffs to introduce affidavit testimony. *See Hutira v. Islamic Republic of Iran,* 211 F. Supp. 2d 115, 124 (D.D.C. 2002); *Weinstein v. Islamic Republic of Iran,* 175 F. Supp. 2d 13 (D.D.C. 2001); *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994); *International Road Federation v Democratic Republic of the Congo*, 131 F.Supp.2d 248, 252 (D.D.C. 2001).

(1) Leah Stern was born on June 23,1928, and was a citizen of the United States at all relevant times, including July 30, 1997.  Affidavit of Joseph Stern, sworn to on January 2, 2003 ("J. Stern Aff.,"), ¶1, Exhibit "A" thereto.

(2) Plaintiffs Joseph Stern (J. Stern Aff, ¶1), Yocheved Kushner (Affidavit of Yocheved Kushner, sworn to on January 2, 2003 ("Kushner Aff."), ¶1), Shimson Stern (Affidavit of Shimson Stern, sworn to on January 2, 2003 ("Shimson Stern Aff."), ¶1) and Shaul Stern (Affidavit of Shaul Stern, sworn to on January 2, 2003 ("Shaul Stern Aff."), ¶1) are U.S. citizens and the children of decedent Leah Stern.

(3) On Friday, July 30, 1997, two suicide bombers belonging to the Hamas terrorist organization and acting on behalf of Hamas entered the Mahane Yehuda outdoor produce market in downtown Jerusalem, which was crowded with Sabbath-eve shoppers.   Affidavit of Ronni Shaked, sworn to on January 1, 2003 ("Shaked Aff."), ¶26.   Each of the bombers carried a briefcase packed with a powerful explosive charge.  Shaked Aff., ¶26. At a pre-arranged signal, the bombers triggered their explosives.   Shaked Aff., ¶26.   The blasts ripped through the crowded market, killing 15 shoppers, including decedent Leah Stern, and wounding another 168 (hereinafter "the bombing attack").   Shaked Aff., ¶26.   In a press release, Hamas claimed responsibility for the bombing attack.   Shaked Aff., ¶26.

(4) As a result of the explosion, Leah Stern suffered horrendous injuries. The explosion caused Leah Stern severe burns, and much of the skin on her face was ripped off by the blast. Leah Stern suffered multiple and diffuse lacerations over the facial area, thorax, abdomen and limbs. Several pieces of shrapnel, specifically nails, lodged in her chin, right breast, right arm,

4

both knees and left thigh. Leah Stern also suffered a gaping abdominal wound which exposed her intestines. Her left leg was covered with burns and lacerations from the explosion, and bones in the lower leg were broken. Leah Stern's right leg was partially severed at the knee, and shrapnel lodged in the remaining portion of her leg. Affidavit of Dr. Alan Friedman, sworn to December 31, 2002 ("Friedman Aff."), ¶¶10-17, Exhibit "A" thereto.

(5) Leah Stern expired from her wounds on the scene on July 30, 1997. *Id.*, ¶¶18-20.

(6) Dr. Alan Friedman, an expert in trauma medicine experienced in the treatment of bomb blast victims, testified on the basis of the postmortem report prepared by pathologists at the L. Greenberg Institute of Forensic Medicine in Tel Aviv that death was not instantaneous for Leah Stern, and that to a reasonable degree of medical certainty, Leah Stern suffered at least several minutes of extreme pain and suffering from the time of the blast until she succumbed to her injuries. *Id.*

(7) Plaintiffs were informed of the attack and of the death of their mother. J. Stern Aff., ¶7; Kushner Aff., ¶7; Shimson Stern Aff., ¶¶10-13; Shaul Stern Aff., ¶10.

(8) The testimony of plaintiffs, Leah Stern's children, each compellingly demonstrates how from the day of the bombing onward, the lives they had previously lead had been irrevocably shattered. Indeed, the continuing emotional impact of the bombing on Leah Stern's children is clearly evident in the substance of their testimony.

(9) It is clear to the Court that the plaintiffs, children of the decedent, have all suffered great emotional anguish, loss, misery and distress, which has continued from the date of the terrorist attack through today. Each of the children had a close relationship with their mother,

who, it is evident from the testimony, made each child feel like his or her relationship was particularly special and close.  Although each plaintiff testified about his or her attempts to cope with the loss of their parent, none have been able to fully heal nor cope with the loss, particularly in light of her cruel, violent, agonizing and senseless death.

(10)  Israeli police eventually apprehended and charged two men, Muaid Said Bilal (hereinafter "Bilal") and Omar Abdel Rahman al-Zaban (hereinafter "Zaban") with participating in the Mahane Yehuda bombing attack on July 30, 1997.  Shaked Aff., ¶27.  Affidavit of Dr. Reuven Paz, sworn to on December 29, 2002 ("Paz Aff."), ¶¶54-67.  Both Bilal and Zaban were convicted by an Israeli court of the murder of Leah Stern and the other victims of the bombing attack, and of membership in and performing services for Hamas.  Shaked Aff., ¶27; Paz Aff., ¶¶54-67.  Bilal and Zaban, and other members of their Hamas cell who were apprehended by Israel, provided Israeli police with a detailed account of the planning, funding and execution of the bombing attack by Hamas.  *Id.*; Shaked Aff., ¶28.

(11)  The decision to carry out the bombing attack was taken and approved by the Hamas senior command, which is the highest decision-making body in Hamas.  Paz Aff., ¶¶59-60.  The Hamas senior command, which was based at that time in Jordan, assigned the task of planning and executing the bombing attack to senior Hamas military commander Mahmoud Abu Hanoud.  Paz Aff., ¶¶59-60; Shaked Aff., ¶¶29-31.

(12)  Mahmoud Abu Hanoud had been active in Hamas since the early 1990s, and was among some 400 Hamas operatives expelled by Israel to Lebanon in 1992.  Paz Aff., ¶¶38-39.  While in Lebanon, Abu Hanoud received military training from Iranian Revolutionary Guards

and from the Iranian proxy group Hizbollah in the use of munitions, explosives, firearms and other terrorist techniques. *Id.* Upon returning to the West Bank, Abu Hanoud became a senior leader in Hamas and put to use the military and terrorist training he had acquired from Iranian and Iranian-proxy forces in Lebanon, planning and executing numerous sophisticated bombing attacks, including the July 30, 1997 bombing. Paz Aff., ¶¶38-39; Shaked Aff., ¶¶26-35.

(13) The Hamas terrorist organization was established by Islamic militants in December 1987. Paz Aff., ¶13. Hamas views Muslims as an oppressed minority which must confront a global conspiracy against Islam. Israel and the United States are regarded, in the view of Hamas, as the greatest enemies of Islam. Paz Aff., ¶¶19 and 26.

(14) Hamas opposes a peaceful resolution of the Middle East conflict, and the charter of Hamas, first published in August 1988, states that, *"There is no solution to the Palestinian problem except by Jihad."* Until at least 1997, Hamas had ruled out any possibility of peace between the Palestinians and Israelis. Paz Aff., ¶17, Exhibit "B" thereto.

(15) Until 1992, Hamas was involved in sporadic attacks against Israeli civilians, mainly using primitive weapons such as knives and Molotov cocktails, but was not organized as an effective terrorist organization because its members had not yet received extensive systematic

---

Abu Hanoud succeeded in eluding capture until November, 2001, when he was killed in a shoot-out with Israeli forces. Shaked Aff., p.12, n.1

Hamas' violent nature has been noted in several federal decisions. see *In re: Abu Marzook,* 924 F. Supp. 565 (S.D. N.Y. 1996) (recounting numerous incidents of Hamas terrorism against civilians in the Mideast), *U.S. v. One 1997 E35 Ford Van,* 50 F. Supp.2d 789 (N.D. Ill. 1999) (describing Hamas' covert financial transactions in the U.S.), (D.D.C. 2000), *Eisenfeld v. Islamic Republic of Iran,* 172 F.Supp.2d 1 (D.D.C. 2000), *Mousa v. Islamic Republic of Iran,* 00-2096(WBB) (Sept. 18, 2001), *Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13 (D.D.C. 2002).

training in munitions, weapons and techniques of conspiracy and insurgency, and did not have adequate foreign financial support. Shaked Aff., ¶¶23, 37; Paz Aff., ¶20.

(16) Hamas began to carry out suicide bombings in Israel in April 1994, soon after Hamas leaders and operatives began receiving training and support from regular and proxy Iranian forces in Lebanon and Iran. Shaked Aff., ¶¶14, 22; Paz Aff., ¶21.

(17) In the early 1980s, The Islamic Republic of Iran, also known as "The Republic of Iran", "Republic of Iran", "The Government of Iran", "Iranian Government", "Imperial Government of Iran", and "Iran" ("Iran"), Affidavit of Dr. Patrick Clawson, sworn to on December 31, 2002 ("Clawson Aff."), ¶36, decided to export its Islamic revolution to other countries by providing material support to militant Islamic organizations around the globe. Paz Aff., ¶22.

(18) Pursuant to its policy of supporting militant Islamic groups, Iran sought out and developed a close relationship with Hamas, and Iran and Hamas eventually entered into a mutually beneficial operational alliance. Paz Aff., ¶¶22-24. The joint goal of the Iran-Hamas alliance is Islamic revolution through jihad, or violent and unrelenting struggle against Israel and the West. Paz Aff., ¶24.

(19) Iran was interested in transforming Hamas into a powerful and deadly terrorist organization for several reasons. Shaked Aff., ¶23. On the ideological plane Iran supports the use of terrorist violence against Jewish and Israeli targets, and by training and funding Hamas to carry out such attacks Iran achieved what it considers an important goal. Shaked Aff., ¶24; Paz Aff., ¶24. Additionally, Iran sought, and still seeks, to strengthen the influence of Islamic groups

within Palestinian society. Shaked Aff., ¶24; Paz Aff., ¶¶22-24. By bolstering Hamas, and turning it into a deadly and effective leader in the fight against Israel, Iran boosted popular support for the Islamic movement among Palestinians. Shaked Aff., ¶24; Paz Aff., ¶¶22-29. Likewise, in the political sphere, Iran was and is interested in using Hamas terrorist attacks to disrupt peace negotiations between Israel and the Arabs. Paz Aff., 22-29; Shaked Aff., ¶24. Accordingly, Iran expended great efforts to initiate a financial and operational alliance with Hamas. Paz Aff., ¶¶22-29.

(20) Hamas shares these Iranian policy goals and was willing to help Iran achieve them, in return for weapons, financing, and military training to conduct and expand its armed struggle against Israel. Shaked Aff., ¶25; Paz Aff., ¶¶22-23.

(21) Relations between Iran and Hamas were formalized in 1988, when Iran agreed to Hamas' request to send a delegation to Iran and to establish an official representation in that county. Since that time Hamas has stationed an "ambassador" in Iran. Paz Aff., 32. Iranian-trained Hamas members also serve as liaison officers between Iran and Hamas. *Id.* Hamas military leader Musa Abu Marzook and Hamas leader Sheik Yassin have also traveled to Iran to coordinate relations. *Id.*

(22) During approximately the past decade, Iran has given Hamas massive financial support and provided professional terrorist training to hundreds of Hamas operatives. Shaked Aff., ¶¶13-19; Paz Aff., generally.

(23) Iran provides terrorist training and economic assistance to Hamas through its Ministry of Information and Security ("MOIS"). Clawson Aff., ¶32. The MOIS has

9

approximately 30,000 employees and a budget of between $50 million and $100 million. Clawson Aff., ¶33. The MOIS provides professional military training for terrorist operations to Hamas, and the funds provided by Iran to Hamas come almost entirely from the MOIS's budget. Paz Aff., ¶31. The MOIS is also responsible for liaising with Hamas and coordinating relations between Iran and Hamas. Paz Aff., ¶32.

(24) For the past decade, Iran has systematically provided military training to hundreds of Hamas terrorists in training camps located in Iran and in Lebanon. Paz Aff., ¶33. The transformation of Hamas into an effective, competent and deadly terrorist organization started in the early 1990's, when Hamas operatives began to receive Iranian military training. Shaked Aff., ¶14.; Paz Aff., ¶34.

---

The MOIS is an Iranian government agency which has been described as "roughly comparable to the KGB of the former Soviet Union." *Anderson v. Islamic Republic of Iran*, 90 F. Supp.2d 107, 112 (D.D.C. 1998).

Along with Iran's Revolutionary Guards, the MOIS is the Iranian government's coordinator of the regime's various terrorist activities. With 30,000 agents, a budget of between $100 and $500 million, it is the largest espionage service in the Middle East. It spends between $50 and $100 million a year sponsoring terrorist activities of various organizations such as Hamas and Hizbollah.

*Id.* at113.

The MOIS functions "within and beyond Iranian territory" and has a specific relationship with Hamas. *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1, 6 (D.D.C. 2000). The MOIS It is the "conduit for the Islamic Republic of Iran's provision of funds to Hamas and training to the terrorists under the direction of Hamas." *Id.* at 6.

(25) Iran operates a large military training camp near Teheran, called "Al-Quds," at which Hamas terrorists are trained.  Paz Aff., ¶34; Shaked Aff., ¶22.  Training of Hamas operatives in Iran began in the early 1990s.  Paz Aff., ¶34; Shaked Aff., ¶22, Exhibits "D" and "E".  In 1994 a group of nineteen Hamas members spent three and a half months in intensive military exercises at the Al-Quds camp.  Paz Aff., ¶36 thereto.  Since that time, large numbers of Hamas operatives have been sent to Iran from the West Bank and Gaza Strip to train at the Al-Quds camp.  Paz Aff., ¶34.

(26) At the Al-Quds camp, Hamas operatives are trained in weapons use, manufacturing explosives and bombs, carrying out assassinations, collection and use of intelligence, clandestine operations and terrorist tactics, shooting from moving vehicles and motorcycles, parachuting and diving.  Paz Aff., ¶¶35-36.  The training at Al-Quds is conducted by the MOIS Revolutionary Guards.  Paz Aff., ¶35.  One group of Hamas operatives spent several years training in Iran, and underwent officers course in the Iranian army college.  Paz Aff., ¶34.

(27) Iran also provides terrorist training to members of Hamas in camps operated by Iran and the Hizbollah terrorist group in Lebanon.  Paz Aff., ¶37.  Hizbollah is an Iranian proxy organization, controlled, funded and operated by Iran.  *Id.*  Training is provided to Hamas

---

Iran's control over Hizbollah is so far-reaching that this Court has repeatedly held Iran vicariously liable, under the doctrine of respondeat superior, for actions of Hizbollah. *See, e.g., Sutherland v. Islamic Republic of Iran*, 151 F.Supp.2d at 47:

> Judge Kotelly of this Court opined: "it is now the universally held view of the intelligence community that Iran was responsible for the formation, funding, training, and management of Hizbollah." *Higgins v. The Islamic Republic of Iran*, Civ. A. No. 99-377 (D.D.C. 2000).  As well, Judge Jackson declared in *Anderson* that the defendants 'financed, organized, armed, and planned Hizbollah operations in Lebanon and elsewhere.'

(citing *Anderson*, *Flatow* and *Eisenfeld*).

(continued...)

operatives in Lebanon both by military instructors belonging to Iranian Revolutionary Guards, which is an official Iranian government agency, and by Hizbollah commanders.  *Id.*

(28) As early as 1992, Iran provided Hamas operatives with training in Hizbollah camps in Lebanon.  Paz Aff., ¶37; Clawson Aff., ¶¶16-19; Shaked Aff., ¶¶14-22, Exhibits "B" and "C". The training of Hamas operatives in Lebanon increased dramatically in 1993, after Hizbollah and Iranian Revolutionary Guard members initiated contact with some 400 Hamas operatives who were deported by Israel to Lebanon, and provided military training to hundreds of the Hamas deportees.  Shaked Aff., ¶15; Paz Aff., ¶38.  This Iranian military training continued for nearly a year, until late 1993, when virtually all of these newly-trained Hamas terrorists returned to the West Bank and Gaza.  Shaked Aff., ¶15.  Since that time, Iran has continued to provide terrorist training to large numbers of Hamas operatives in Hizbollah bases in Lebanon.

(29) The Iranian training provided to Hamas operatives in Lebanon included the manufacture and use of munitions, bombs and explosives, including TNT and plastic explosives, and a broad range of firearms and weapons training including the use of RPG and LAW shoulder-missiles. Paz Aff., ¶37, Exhibit "D" thereto.  Hamas members in Lebanon were also trained in ambush techniques, sabotage, methods of subterfuge and intelligence gathering, and navigation.

───────────────────────

(...continued)

Therefore, Hizbollah's "acts, which were intentionally committed by Sutherland's captors, are attributable to the defendants because the defendants substantially funded and controlled Hizbollah . . . As such, the defendants are liable under the tort doctrines of respondeat superior and joint and several liability."  *Id.* at 48.

(30) The Hamas members trained by Iran are highly educated and include university graduates. Paz Aff., ¶41. These operatives are specifically trained by Iran to constitute a cadre of commanders and cell leaders, in order to return to Gaza and the West Bank in order to train and lead others. *Id.* The Hamas members who received Iranian training in Lebanon and Iran have become senior military commanders, the "officers corps" of the organization, who build bombs and explosive devices, and plan, direct and supervise suicide bombings and other terrorist attacks. *Id.*

(31) The expulsion of the 400-plus leading Hamas members to Lebanon, where they received professional terrorist training from Iran and its proxies, proved to be the watershed event in Hamas' rise and development as professional and effective terrorist organization. Clawson Aff., ¶¶18-19, 21. By December, 1993, nearly all of the 400 deportees had returned to the West Bank and Gaza Strip. Clawson Aff., ¶21. The returning Hamas members, armed with professional, Iranian-supplied training in munitions and explosives, quickly established an operational and organizational infrastructure far more deadly and effective than that which Hamas had previously been capable of maintaining.

(32) Among the group of Hamas deportees who were trained by Iran in Lebanon was Mahmoud Abu Hanoud, who later returned to the West Bank. Shaked Aff., ¶15; Paz Aff., ¶39. Upon his return to the West Bank, Abu Hanoud's Iranian training qualified him as a senior Hamas military commander. Shaked Aff., ¶30; Paz Aff., ¶39. Until his death in November 2001, Abu Hanoud organized, planned and executed a large number of deadly terrorist

13

bombings, including the bombing of the Mahane Yehuda market in Jerusalem on July 30, 1997. Shaked Aff., ¶30; Paz Aff., ¶39.

(33) In the early 1990's Iran began to give large sums of money to Hamas in order to allow the organization to build an operational infrastructure to commit terrorist activity in Israel. Iran has provided tens of millions of dollars to Hamas for terrorism since the early 1990s.  Paz Aff., ¶43.

(34)  Iran gave Hamas financial support in 1996 and 1997 in amounts between $25-$50 million.  Clawson Aff., ¶23.  These cash payments to Hamas are in addition to other forms of support.

(35) After a successful terrorist attack, Iran provides payments to Hamas to reward it. During the mid 1990s, including 1997, Iran was spending $200 million on terrorism each year. Clawson Aff., ¶23.  Numerous sources, including those in Iran, indicate that Iran provides payment to Hamas after a terrorist action, especially those of a spectacular nature such as suicide bombings.  Clawson Aff., ¶24.

(36) Additionally, Iran provides operational support to Hamas including false documents and transportation to numerous Mideast locations.  Paz Aff., ¶46.  Iran also provides propaganda support through its radio stations and newspapers throughout the Muslim world.  Clawson Aff., ¶28.

(37) Iranian government support for terrorism is an official state policy and the approval of high-ranking Iranian political figures including defendants Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani, and Ali Fallahian-Khuzestani was necessary for Iranian agencies

such as the MOIS to support Hamas with training and economic assistance.  Paz Aff., ¶47; Clawson Aff., ¶34.  Iran's support of Hamas could not occur without this approval.

(38) Iran's leader Ayatollah Khamenei first approved the MOIS' provision of support to Hamas and other Islamic organizations in 1988. Paz Aff., ¶48.  Then-president Ali Akbar Hashemi-Rafsanjani encouraged Iran's relationship with Islamic terrorist organizations such as Hamas. Iran's support of Hamas could not occur without this approval.  *Id.*

(39) Ali Fallahian-Khuzestani, former head of the MOIS, created the policy of providing day-to-day help and assistance to Islamic terrorist organizations such as Hamas. Iran's support of Hamas could not occur without this approval.  *Id.*

(40) Iran is now, and since about 1985 has been continuously listed on the U.S.  State Department's list of state sponsors of terrorism as set forth in an annual report entitled "Patterns of Global Terrorism". According to the 1997 Global Patterns report, Iran was "the" principal state sponsor of terrorism in 1996-1997. The report specifies Iran's support for Hamas:

> "Iran continued to provide support – in the form of, training, money and/or weapons - - to a variety of terrorist groups, such as . . .  Hamas . . .  The Iranian Government continued to oppose any recognition of Israel and to encourage violent rejection of the Middle East peace process.  In the fall of 1997, Tehran hosted numerous representatives of the terrorist groups – including Hamas, . . .  at a conference of "Liberation Movements." Participants reportedly discussed the jihad, established greater coordination between certain groups, and an increase in support for some groups."

*Id.* Clawson Aff., ¶13, Exhibit "B" thereto.

(41) The approval of high-ranking political figures such as Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani, and Ali Fallahian-Khuzestani was necessary for Iranian agencies such as the MOIS to support Hamas with training and economic assistance. Clawson Aff., ¶34.   High-level Iranian government officials provide "operational policy advice to terrorists." *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27 (D.D.C. 2001). Hamas is a particular favorite of Iran, and acknowledges receiving $15 million of support per month from Iran. *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp. 2d 1 (D.D.C. 2000), see also *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 22 (D.D.C. 2002) ("There is no question that Hamas and its agents received massive material and technical support from The Islamic Republic of Iran").

(42) Iran and Hamas brazenly publicize such support. For example, Hassan Salameh, a Hamas leader in the West Bank and Gaza Strip, boasted on American television of his sophisticated training (in the uses of explosives, grenades, automatic weapons, RPG and LAW missiles, planning ambushes, use of land mines, etc.) in Iran by members of its military. *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d at 8.

(43) By 1997, the professional military training provided to Hamas by Iran had significantly boosted Hamas' operational capabilities.  Shaked Aff., ¶¶13-15; Paz Aff., ¶70.  A decade ago Hamas was incapable, despite its violent rhetoric, of mounting massive bombing attacks and its terrorist activities were mainly confined to stabbings and sporadic drive-by

shootings.  Paz Aff., ¶70.  The professional military training provided by Iran to hundreds of Hamas operatives completely transformed Hamas.  Shaked Aff., ¶¶13-15.  These Iranian-trained Hamas operatives, who are experts in munitions, bomb-making, weapons and covert activities now make up the "officers corps" of Hamas in the West Bank and Gaza, and serve both as military commanders and military instructors - i.e. they both organize and lead terrorist attacks, and pass on to the next generation of Hamas terrorists the training which they received from Iran. Moreover, without Iranian financial support, Hamas would have been extremely limited in its operational capabilities. This transformation of Hamas into an effective and deadly terrorist group was, and remains, the explicit goal of Iran in providing this training, and Iran has very successfully attained this goal.

(44) The bombing attack carried out on July 30, 1997, in which Leah Stern was murdered, exemplifies the Iranian contribution to Hamas' operational and financial capabilities. Shaked Aff., ¶39.  This attack was planned and carried out under the direction of Mahmoud Abu Hanoud.  Shaked Aff., ¶39; Paz Aff., ¶58.  As mentioned above, Abu Hanoud was deported to Lebanon in 1992, and was among the Hamas deportees who received training in munitions, weapons use and covert operations by Iranian and Iranian proxies in Lebanon.  Paz Aff., ¶58.

(45) After receiving written instructions from the Hamas senior command to carry out the bombing attack, Abu Hanoud assembled a highly-specialized team of Hamas terrorist operatives to execute the attack.  Shaked Aff., ¶31; Paz Aff., ¶¶60-61.  The team was well-organized, each member was assigned specific tasks, and operated with military discipline under the command of Abu Hanoud.  Shaked Aff., ¶31; Paz Aff., ¶¶60-68.

(46) The logistics of the bombing attack were complex and expensive: for the purpose of this attack Abu Hanoud's team purchased, on his instructions, large quantities of chemicals used to manufacture explosives, rented a storage room to hide and manufacture the explosives, rented a safe-house for the use of team members before and after the attack, rented vehicles and purchased disguises.  Shaked Aff., ¶32.  These logistical preparations cost many thousands of dollars, and were paid for directly by Abu Hanoud using funds provided to him specifically for this purpose by the Hamas command.  Shaked Aff., ¶32; Paz Aff., ¶65.

(47) Abu Hanoud constructed the bombs used in the attack utilizing the Iranian training he had received in Lebanon.  Shaked Aff., ¶34; Paz Aff., ¶59.  Abu Hanoud directed the manufacture of the explosives from raw materials, using sophisticated chemical mixing techniques and cooling methods learned by him during his training.  Shaked Aff., ¶34; Paz Aff., ¶62.  Abu Hanoud told Bilal that some 30 kilograms of explosives were manufactured in preparation for the bombing.  Paz Aff., ¶62.

(48) In addition, a Hamas operative captured and charged by Israel with aiding Abu Hanoud in the attack, Iman Halawa, sketched for Israeli police a diagram of the electronic triggering mechanism used by Abu Hanoud's team.  Shaked Aff., ¶34, Exhibit "G".  This complex electronic triggering mechanism was constructed using the know-how and professional military training provided to Abu Hanoud by Iranian agents in Lebanon.

(49) Abu Hanoud also planned the attack using the professional methods of camouflage and disguise that he had been taught in Lebanon, in order to ensure the success of the attack and prevent the Israeli security services from discovering the identities of the bombers and their

handlers. The bombers were ordered to score their fingertips with razor blades and fill the wounds with instant contact glue to prevent their identification by fingerprints. In addition, the manufacturers' tags had been removed from their clothing in order to disguise their origins. The bombers were disguised to enable them to infiltrate into the heart of downtown Jerusalem without arousing suspicion. The site of the attack, the Mahane Yehuda market, has been the site of past terrorist attacks, and is one of the most heavily guarded and patrolled locations in Israel. The bombers were also instructed to stagger the explosions, in order to kill and maim rescue personnel who would respond to the first blast.  Shaked Aff., ¶35.

(50) In every respect, the bombing of the Mahane Yehuda market on July 30, 1997 by Hamas was the work of "professionals", utilizing to deadly effect the training provided by the defendants.  Shaked Aff., ¶¶38-40.

## III.   CONCLUSIONS OF LAW

### A.   Jurisdiction and Foreign Sovereign Immunity

This Court has original subject matter jurisdiction over suits under the FSIA against foreign states which are not entitled to immunity. 28 U.S.C. §1330(a), *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989).

The FSIA eliminates the sovereign immunity of foreign states for acts of state-sponsored terrorism "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while

acting within the scope of his or her office, employment, or agency . . . " 28 U.S.C. §1605(a)(7). The FSIA further provides that "an official, employee, or agent of a foreign state designated as a state sponsor of terrorism . . . shall be liable to a United States national or the national's legal representatives for personal injury or death caused by acts . . . for which the courts of the United States may maintain jurisdiction . . . " 28 U.S.C. §1605 note, Civil Liability for Acts of State Sponsored Terrorism.

In order to establish subject matter jurisdiction and lift immunity pursuant to §1605(a)(7) and §1605 note, plaintiffs must show the following elements:

> (1) that personal injury or death resulted from an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking; and

> (2) the act was either perpetrated by a foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendant; and

> (3) the act or provision of material support or resources is engaged in by an agent, official, or employee of the foreign state while acting within the scope of his or her office, agency, or employment; and

> (4) that the foreign state be designated as a state sponsor of terrorism either at the time the incident complained of occurred or was later so designated as a result of such act; and

> (5) if the incident complained of occurred within the foreign state defendant's territory, plaintiff has offered the defendants a reasonable opportunity to arbitrate the matter; and

> (6) either the plaintiff or the victim was a United States national at the time of the incident; and

---

Section 1605 (a) (7) was enacted in April 1996 and was expressly intended to apply to causes of action arising both before and after its passage. Pub. L. No. 104-132, Title II, § 221(c) (April 24, 1996). Section 1605 Note was enacted in September 1996. Pub. L. No. 104-208, Div. A, Title I, § 101(c) (Sept. 30, 1996). The two should be construed *in pari materia*, and the later amendment relates back to the earlier one. see *Flatow v  Islamic Republic of Iran*, 999 F.Supp. 1, 13-14 (D.D.C. 1998)

(7) similar conduct by United States agents, officials, or employees within the United States would be actionable.

*See, e.g., Elahi v. Islamic Republic of Iran*, 124 F. Supp.2d 97, 106-107.

The testimony and evidence presented establishes that each of these requirements is satisfied in this case, as detailed below.

The Court first finds that the death of Leah Stern and plaintiffs' injuries were caused by the bombing attack carried out by Hamas in Jerusalem on July 30, 1997, which attack was an act of extrajudicial killing within the meaning of 28 U.S.C. § 1605(a)(7).

Additionally, the Court also finds that Iran and the MOIS provided "material support or resources" to Hamas and its operatives, within the meaning of 28 U.S.C. §1605(a)(7), for the specific purpose of carrying out such acts of extrajudicial killing.

A finding that Iran provided material support to Hamas for such bombings is further supported by precedent. *See e.g. Weinstein v. The Islamic Republic of Iran*, 184 F.Supp.2d 13, 22 (D.D.C. 2002) ("There is no question that Hamas and its agents received massive material and technical support from the Islamic Republic of Iran").

The Court also finds that defendants MOIS, an agency of Iran, Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani, and Ali Fallahian-Khuzestani who are officials and employees of Iran, provided material support and resources to Hamas for such bombings while acting within the scope of their office, agency and employment.

---

§1605(e)(1) adopts the definition of an extrajudicial killing contained in the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992) (codified at 28 U.S.C. §1350 note), i. e., "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples."

The Court also finds that Iran was designated as a state sponsor of terrorism by the United States both at the time that Iran provided Hamas with material support and resources and at the time of the bombing.

The Court further finds that the decedent and the plaintiffs were at the time of the attack and remain until today United States citizens. Under the FSIA, immunity is abrogated and subject matter jurisdiction is conferred for claims under 28 U.S.C. §1605(a)(7) if "either the plaintiff or the victim [was] a United States national at the time of the incident." *Flatow v. Islamic Republic of Iran*, 999 F. Supp.1, 16 (D.D.C. 1998).

Finally, the Court finds that if an official of the United States, acting in his official capacity, provided material support to an organization such as Hamas in order to cause or facilitate terrorist attacks, he would be liable and unable to claim a defense of immunity. 42 U.S.C. §1983, *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

Based on these findings, the Court therefore concludes that the defendants are not immune from this action and that it has subject-matter jurisdiction over this action.

The FSIA also provides that personal jurisdiction over defendants will exist where service of process has been accomplished pursuant to 28 U.S.C. §1608 and plaintiff establishes the applicability of an exception to immunity pursuant to 28 U.S.C. §1605. *Flatow*, 999 F. Supp. 1, 19. Since service of process has been effected pursuant to 28 U.S.C. §1608 and plaintiffs have established an exception to immunity, this Court has *in personam* jurisdiction over defendants.

---

Because the attack did not occur within the Iranian territory, plaintiffs are not required to offer the defendants an opportunity to arbitrate.

22

### B.   Liability

The FSIA provision governing liability, 28 U.S.C. §1606, provides that foreign states "shall be liable in the same manner and to the same extent as a private individual under like circumstances" on any claim for which they are not entitled to immunity under §1605. In examining defendants' liability in tort, "the Court applies federal common law," *Sutherland* at 47, as well the law of this district, *Flatow* at 15, n.6.

Applying common law rules of tort liability, this Court finds that defendants are liable for the wrongful death of Leah Stern and the related torts pled by plaintiffs, all of which arise from the July 30, 1997, bombing in Jerusalem.

As described above, this Court has found that defendants provided Hamas with massive material support and resources, including military training of hundreds of operatives, for the express purpose of carrying out terrorist attacks such as the bombing on July 30, 1997. Additionally, in the years prior to the attack, defendants provided Hamas with many tens of millions of dollars, specifically earmarked for terrorist attacks of this type.

The expert testimonies introduced by the plaintiffs were unanimous in concluding that without Iranian military training and financial support, Hamas would have been extremely limited in its operational capabilities, and unable to mount expensive and technically complex suicide bombings, including the bombing in the Mahane Yehuda market on July 30, 1997. The "successful" execution of a powerful bombing by disguised terrorists in the heart of the heavily guarded capital of Israel required professional training and financial support. Training and funding for this and other similar attacks was provided by Iran.

23

The senior Hamas operative who planned, organized and directed the manufacture of the bombs and execution of the attack, Mahmoud Abu Hanoud, received professional military training in the manufacture and use of explosive devices, subterfuge, intelligence-gathering and other terrorist techniques which were put to deadly use in the bombing. Preparations for this single attack were complex and costly. Absent Iranian training and funding, Hamas would have lacked the capability to carry out this attack.

These findings, detailed fully above, render defendants liable in tort for the injuries suffered by the plaintiffs.

Indeed, the circumstances establishing defendants' liability in this case are essentially identical to the circumstances of the Hamas bombing which was the subject of the decisions of this Court in *Eisenfeld, Weinstein* and *Mousa*. In those cases, this Court held Iran and the other instant defendants liable for wrongful death and personal injuries of U.S. citizens caused by a Hamas bus bombing in Jerusalem, on February 25, 1996. This Court found Iran and the instant defendants liable for the 1996 Hamas bombing on the basis of both their general provision of massive financial resources and training to Hamas, and on the grounds that Hassan Salameh, the Hamas terrorist who organized and commanded that attack, had received Iranian training in the use of weapons and explosives. Likewise, in this case, another "alumnus" of Iranian terrorist training courses, Mahmoud Abu Hanoud, planned, organized and directed the July 30, 1997,

_____

Here, too, to the extent that these actions were carried out by the MOIS or the individual defendants, the Islamic Republic of Iran is liable on the basis of the doctrine of respondeat superior.

24

bombing and the preparation of the explosive charges used therein. Defendants' liability in the instant matter therefore parallels their liability in *Eisenfeld, Weinstein* and *Mousa.*

The Court therefore finds the defendants jointly and severally liable for defendants' damages.

## IV.   **DAMAGES**

*a. Survival Action – Pain and Suffering.*

(1) As detailed above, Dr. Alan Friedman, an expert in trauma medicine, testified about the injuries sustained by Leah Stern in the bombing. On the basis of the post mortem report prepared by Israeli pathologists, Dr. Friedman found that Leah Stern suffered several minutes of extreme pain and suffering before succumbing to her injuries.

(2) The courts have recognized the right to pain and suffering in cases involving less onerous circumstances.

> If Plaintiff presents sufficient evidence of conscious pain and suffering, determination of the compensation has largely been relegated to the discretion of the trier of fact by courts in this jurisdiction based upon factors including the duration and nature of the suffering endured. The United States Court of Appeals for the District of Columbia Circuit has firmly established that the trier of fact has broad discretion in calculating damages for pain and suffering.

*Taylor v. Washington Terminal Co.* 409 F.2d 145, 150 (D.C. Cir. 1969).

(3) An award is even more warranted in an action for a violent and cruel death by terrorism,

> As the cases clearly indicate, the courts have increasingly been awarding monetary
>
> relief for the suffering exacted when a person, in the midst of his normal enjoyment

of life, is suddenly and cruelly required to confront his death, as well as to experience it.

Notes, Kimball, Axelrod & Goldstein, Damages in Tort Actions, §21.02[4].

(4) In suits involving acts of terrorism, the federal courts have routinely awarded survival damages to the deceased's estate for the physical and emotional pain and suffering endured by the victim in the moments before death. The courts have recognized that even very short periods of pain and suffering prior to death in a terrorist attack are compensable. *See, e.g., Elahi v. Islamic Republic of Iran*, 124 F. Supp.2d 97 at 113 ($1 million awarded when witness testified that death occurred "at least something like 30 seconds" following shooting); *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1, (D.D.C. 2000) at 5 ($1 million awarded for each victim of a bombing who survived for "several minutes"); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 at 29 (D.D.C. 1998) ($1 million award when "conscious pain and suffering continued for at least three to five hours.")

(5) The physical pain and mental anguish consciously suffered by Leah Stern in the final moments of her life were excruciating. Moreover, unique to this case is fact that Mrs. Stern was advanced in age.

(6) The Court therefore finds appropriate an award of One Million Dollars ($1,000,000) for Leah Stern's pain and suffering prior to death.

*b. Solatium.*

(7) The Foreign Sovereign Immunities Act provides for an award for solatium.  As this Court noted in *Flatow,* 999 F. Supp. at 29, damages for solatium belong to the individual heir personally for injury to the feelings and loss of decedent's comfort and society.  The unexpected quality of a death may be taken into consideration in gauging the emotional impact to those left behind. In this case the impact upon Leah Stern's children was devastating. One of the aspects of terrorism is its targeting of the innocent with the intent to create maximum emotional impact. This type of action deserves a reply in damages that will fully compensate for the truly terrible emotional suffering of the surviving children.

(8) In previous actions for wrongful death brought under the FSIA, this Court has awarded solatium damages in the amount of $5,000,000.00 for the loss of a child and $2,500,000.00 for the loss of a sibling. *See Flatow* and *Eisenfeld*, respectively.

(9) This case differs from *Flatow* and *Eisenfeld*, however. Unlike *Eisenfeld* and *Flatow*, this case involved the loss of a parent. *See, e.g. Alejandre v. The Republic of Cuba*, 996 F.Supp. (239, 1249 S.D. Fla. 1997) (awarding daughter of decedent Alejandre, who died after his plane was shot down by Cuban jets, $8,000,000 for mental pain and suffering and loss of companionship).

(10) The Court concludes as a matter of law that the following amounts are appropriate compensation for this element of damages under these facts: Joseph Stern: $3,000,000.00; Shimson Stern: $3,000,000.00; Shaul Stern: $3,000,000.00; and Yocheved Kushner: $3,000,000.00.

(11) *Punitive Damages*.   While 28 U.S.C. §1606 prohibits the direct imposition of punitive damages on a foreign state, it permits such damages against agencies and instrumentalities of a foreign state.   See Weinstein v. Islamic Republic of Iran, 184 F.Supp. 2d 13, 24 n.1 (explaining that the FSIA does not authorize punitive damages awards against foreign states themselves, as opposed to their agencies and instrumentalities).

As noted by the Court in *Flatow*, punitive damages "are designed 'to punish [a defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future,' *id* at 32 citing RESTATEMENT (SECOND) TORTS §908(1) (1977). In light of Iran's continued and massive support for terrorism, it would be manifestly unjust to refrain from assessing punitive damages against its agents and instrumentalities in the instant case.

Moreover, the failure to impose punitive damages after several previous impositions might be construed by Iran as a capitulation by the United States in the struggle to prevent and punish terrorism.   See Jenco v. Islamic Republic of Iran, 154 F.Supp.2d 27, 39 (D.D.C.  2001). Permitting Iran to draw such a conclusion would undermine the deterrent effect which is the raison d'etre of §1605(a)(7):

> **As it proved impossible to fight terrorism by bringing the terrorists themselves to justice, Congress created jurisdiction over and rights of action against foreign state sponsors of terrorism. By creating these rights of action, Congress intended that the Courts impose a substantial financial cost on states which sponsor terrorist groups whose activities kill American citizens. This cost functions both as a direct deterrent, and also as a disabling mechanism: if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed.**

*Flatow* at 33.

28

Punitive damages are awarded to punish a defendant for particularly egregious conduct, and to serve as a deterrent to future conduct of the same type. They require an assessment by the Court of the wealth of the defendant and character of the defendant. *Flatow*, 999 F. Supp. at 32. According to Dr. Clawson, in 1997, the amount spent on terrorism by Iran was between $100,000,000.00 and $200,000,000.00, a substantial increase from 1995, the year of the attack in the *Flatow* case. Dr. Clawson testified that imposing severe punitive damages against Iran has great deterrent effect. Indeed, the punitive damage awards in the FSIA cases to date against Iran have received a great deal of attention in the Iranian press. This has sparked debate in the Iranian parliament regarding relations with the United States, and the FSIA lawsuits were cited as examples of Iran's failings in that regard. In addition, in order to deter the type of senseless and destructive terrorist acts which are the subject of this case, an ample punitive damage award should be entered. In *Eisenfeld*, this Court expressed its hope that punitive damages equal to three times Iran's annual expenditure would serve to deter future such attacks. The Court therefore finds that punitive damages against all defendants other than the Islamic Republic of Iran, jointly and severally, in the amount of $300 million is appropriate.

## V.   CONCLUSION

This Court possesses subject matter jurisdiction over this action and personal jurisdiction over Defendants. Plaintiffs have established to this Court's satisfaction, pursuant to 28 U.S.C. §1608(e), and by clear and convincing evidence, that Defendants, the Islamic Republic of Iran, the Iranian Ministry of Information and Security, Ayatollah Ali Hoseini Khamenei, former President Ali Akbar Hashemi-Rafsanjani, and former Minister Ali Fallahian-Khuzestani, are

jointly and severally liable for all damages awarded by this Court for their provision of material support and resources to a terrorist group that caused the extrajudicial killing of Leah Stern and harm to the plaintiffs.

This Court takes note of the Stern family's courage and steadfastness in pursuing this litigation, and their efforts to do something to deter more tragic deaths and suffering of innocent Americans at the hands of these terrorists. Their efforts are to be commended.

A separate order shall issue this date.

DATE:   *7-17-03*

Royce C. Lamberth
United States District Judge